People v Zubidi (2024 NY Slip Op 04824)

People v Zubidi

2024 NY Slip Op 04824

Decided on October 03, 2024

Appellate Division, First Department

O'Neill Levy, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: October 03, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Jeffrey K. Oing
David Friedman Lizbeth González Julio Rodriguez III Kelly O'Neill Levy

Index No. 1731/19 Appeal No. 2534 Case No. 2022-02960 

[*1]The People of The State of New York, Respondent,
v
Amado Zubidi, Defendant-Appellant.

Defendant appeals from a judgment of the Supreme Court, New York County (April A. Newbauer, J.), rendered June 30, 2022, convicting him, after a jury trial, of criminal possession of a weapon in the second degree (four counts) and reckless endangerment in the first degree and sentencing him to an aggregate term of 9½ years.

Jenay Nurse Guilford, Center for Appellate Litigation, New York (Barbara Zolot of counsel), for appellant.
Alvin L. Bragg, Jr., District Attorney, New York (Franklin R. Guenthner and Alexander Michaels of counsel), for respondent.

O'Neill Levy, J. 

Defendant appeals from a judgment convicting him of criminal possession of a weapon in the second degree (four counts) and reckless endangerment in the first degree. On appeal, defendant contends that police did not have reasonable suspicion to stop his van and lacked probable cause to arrest him, the lineup identification procedure was unduly suggestive, and that his sentences are excessive to the extent that the sentences run consecutively. We disagree and now affirm.
Defendant first challenges the court's denial of his suppression motion. He argues that the police lacked reasonable suspicion to stop his van because they did not identify him as the van's driver before initiating the stop. This specific argument was not raised before the suppression court. However, the court found that police had reasonable suspicion to believe the driver of the vehicle on the date of the stop had committed two prior separate criminal acts; therefore, the court found that the stop was lawful.
The touchstone of any analysis of an encounter between police and a citizen is reasonableness (Pennsylvania v Mimms, 434 US 106, 109 [1977]). The issue here is whether it is reasonable for a police officer to stop a vehicle that is known to have been involved in two recent prior criminal incidents.
The suppression hearing record shows a witness reported to Detective Lawrence Thomas of the New York City Police Department that the driver of a white Dodge Caravan, with New York license plate number JFA 9935, discharged a weapon during a road rage incident in Washington Heights on April 28, 2019. The witness described the driver as a Hispanic male in his thirties with a medium build and facial hair. From the license plate number, Detective Thomas learned that the van was registered to defendant at his address on Baruch Drive in Manhattan. Detective Thomas visited defendant at his listed address to attempt to interview him on April 29th. Nobody answered the door, so Detective Thomas left a suspect investigation card (I-card). According to Detective Thomas, a suspect I-card is issued to a person of interest in an investigation when there is not enough evidence to make an arrest.
Defendant called Detective Thomas the next day, April 30th. On the call, Detective Thomas informed defendant that he was investigating an incident that occurred in Washington Heights on April 28th. Defendant said he was aware of [*2]the incident, but that he did not know what happened, although he did report that he heard a loud bang. Detective Thomas then issued a be-on-the-lookout (BOLO) alert for the van on May 2nd because a firearm was involved in the April 28th incident.
Subsequently, on May 17, 2019, a traffic agent noticed a white Dodge Caravan parked in front of a fire hydrant on Baruch Drive. As the agent was approaching the van to place a summons on the windshield, the driver sped away, nearly running the agent over. The agent reported the incident to police officers Daniel Amaral and Joseph Stokes, and noted the van's license plate number, New York JFA 9935. Officer Amaral searched the license plate number in the Domain Awareness System (DAS), a government database, and learned that the van was registered to defendant and that it was wanted in connection with the April 28th incident. Later that evening Officers Amaral and Stokes noticed a white Dodge Caravan with license plate number JFA 9935 parked on Rivington Street, near Baruch Drive. The officers resolved to pull the van over if they saw it drive away. The following morning, May 18, 2019, Officers Amaral and Stokes observed the van pull away from its parking spot on Rivington Street and turn right onto Columbia Street. The officers then pulled the van over and requested backup.
Officer Amaral approached the van on the driver's side. Defendant, driving the van, was the only occupant. Officer Amaral asked for license and registration and for defendant to turn the van off. Officer Amaral then asked if defendant was the owner of the van and if anyone else used it; defendant answered yes to the first question and appeared to nod in agreement to the second question. In order to keep the situation calm in case there was a firearm in the van, Officers Amaral and Stokes asked defendant to step out. Defendant initially started to cooperate but then sat back in the driver's seat and refused to exit. As Officer Stokes and Officer Jose Aracena, who had arrived as backup, attempted to remove defendant from the van, defendant reached into the center console, removed a gun wrapped in a blue towel, and pointed it at Officer Aracena. Officer Aracena shouted that defendant had a gun and Officer Luis Perez tased defendant three times. Defendant was then placed in handcuffs. Later that day, Detective Thomas conducted a lineup identification with defendant and four fillers. The four fillers were Hispanic men between 20 and 30 years old with facial hair and medium builds. The witness to the April 28th incident identified defendant as the shooter; the traffic enforcement agent identified a filler.
The court found that the stop on May 18th was supported by reasonable suspicion based on articulable and credible facts. Initially, "the determination of the suppression court with its peculiar advantages of having seen and heard the testimony is entitled to great deference" (People v Wheeler, 2 NY3d 370, 374 [2004] [internal quotation [*3]marks omitted]).
A forceable stop and detention is authorized "[w]here a police officer entertains a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor" (People v De Bour, 40 NY2d 210, 223 [1976]).
"Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious [person] under the circumstances to believe criminal activity is at hand. To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion" (People v Cantor, 36 NY2d 106, 112-113 [1975] [emphasis added] [internal citations omitted]).
Here, before stopping the van, the BOLO alert notified Officers Amaral and Stokes of the criminal activity involving the van on April 28th; the officers were also aware of the May 17th incident because they both responded to the traffic enforcement agent's call for backup. The officers' knowledge of either incident alone furnished reasonable suspicion of criminal activity at hand (see People v Shabazz, 99 NY2d 634, 636 [2003]; see e.g. People v Rose, 72 AD3d 1341 [3d Dept 2010], lv denied 16 NY3d 745 [2011]; see generally People v Balkman, 35 NY3d 556, 559 [2020]).
Our dissenting colleague and defendant both note that Officers Amaral and Stokes never observed defendant enter or drive the van on May 18th; thus, they were never able to verify, before initiating the stop, that that the driver of the van on May 18th matched the description of the driver on April 28th. Therefore, they contend, the stop was not supported by reasonable suspicion because at the time of the stop Officers Amaral and Stokes did not have information connecting the driver of the van on May 18th to the driver of the van on April 28th and May 17th; the inference the officers drew — that the van's registered owner, defendant, was the van's driver on the dates in question — was too general to support reasonable suspicion.
We respectfully disagree. First, reasonable suspicion must be based on specific and articulable facts, but police officers may also draw logical inferences from such facts (Cantor, 36 NY2d at 113). Second, although reasonable suspicion requires more than a mere hunch, the standard is "considerably less than proof of wrongdoing by a preponderance of the evidence" (Navarette v California, 572 US 393, 397 [2014] [internal quotation marks omitted]). Information revealed by a license plate search in a government database alone may provide reasonable suspicion when that information is reliable (see Balkman, 35 NY3d at 559; see also Kansas v Glover, 589 US 376, 381 [2020] [observing that it is reasonable to infer that a vehicle's owner is that vehicle's driver]).[FN1] Indeed, Officers Amaral and Stokes did not know that defendant was driving the van on April 28th, May 17th, or May 18th; however, their logical inference, based upon the vehicle's registration, amounted [*4]to more than a mere hunch (see Balkman,35 NY3d at 559; cf. People v Lindsey, 13 AD3d 651, 651-652 [2d Dept 2004] [police lacked reasonable suspicion to initiate a car stop to investigate a shooting that occurred a month earlier because they had no information linking the defendant to the car]).
Contrary to the dissent's position, our reliance on Balkman for the proposition that the results of a license plate search may provide police with reasonable suspicion to stop a driver for a non-traffic-related offense is not misplaced. There, the Court of Appeals held that
"[w]hile information generated by running a license-plate number through a government database may provide police with reasonable suspicion to stop a vehicle, the information's sufficiency to establish reasonable suspicion is not presumed. Thus, when police stop a vehicle based solely on such information, and the defendant . . . challenges its sufficiency, the People must present evidence of the content of the information" (Balkman, 35 NY3d at 559 [internal citations omitted]).
Here, defendant never challenged the sufficiency of the DAS search results, the information Officers Amaral and Stokes learned from the license plate search (cf. id. at 559-560).[FN2] Moreover, Officer Amaral testified to the contents of the DAS search results - specifically, the BOLO alert (cf. id.). The BOLO alert, not the DAS search itself, supplied the officers with reasonable suspicion to stop the van (cf. People v Hinshaw, 35 NY3d 427, 437-438 [2020]).
Additionally, the dissent discredits Balkman for its citation to People v Bushey (29 NY3d 158 [2017]) to support the proposition stated above. In Bushey, the Court of Appeals held that "information obtained indicating the registration of the vehicle is in violation of the [Vehicle and Traffic Law] as a result of this check may provide probable cause for the officer to stop the driver of the vehicle" (id. at 160). Balkman applies this rule to felony and misdemeanor stops based on reasonable suspicion (see 35 NY3d at 559, citing Bushey, 29 NY3d at 160).
The dissent further disagrees with our conclusion based on a lack of geographic and temporal proximity of the May 18th stop and the April 28th incident.[FN3] Reasonable suspicion for a level three stop is based on the totality of the circumstances (see People v Rodriguez, 41 NY3d 1, 7 [2023], citing Navarette, 572 US at 397). The emphasis on geographic and temporal proximity in the cases the dissent cites are discrete circumstances among the totality of circumstances particular to those cases; such emphasis is not stated as a universal requirement of reasonable suspicion (see People v Argyris, 99 AD3d 808, 810 [2d Dept 2012], affd 24 NY3d 1138 [2014], cert denied 577 US 1069 [2016] [reasonable suspicion to stop a vehicle based on the description of the vehicle and its license plate number, and the observation of the vehicle in close geographic and temporal proximity to the reported criminal activity]; Rose, 72 AD3d [*5]at 1342-1344 [reasonable suspicion to stop a vehicle in Ulster County in connection with a shooting in Albany County where the vehicle closely matched the description given on a BOLO alert, was heading towards New York City as predicted by the victim, and a license plate number search revealed that the vehicle was registered to an address in Bronx County]; People v Fleming, 65 AD3d 702, 703 [2d Dept 2009], lv denied 13 NY3d 907 [2009] [reasonable suspicion to stop a vehicle in close geographical and temporal proximity to a robbery where the vehicle had the same license plate number as reported by a witness]; People v Schwing, 14 AD3d 867, 868 [3d Dept 2005] [reasonable suspicion to stop a vehicle matching a description and license plate number given by a victim shortly after the victim reported the incident and a few blocks away from the scene of the incident]; People v Elmore, 236 AD2d 851, 851-852 [4th Dept 1997], lv denied 89 NY2d 1034 [1997] [reasonable suspicion to stop a vehicle hours after a reported robbery where occupants of the vehicle matched the description of the suspects, the vehicle and license plate number matched the description given by a witness, and the driver attempted to evade police after the officer activated sirens and lights]). None of these cases hold that reasonable suspicion always turns on geographic and temporal proximity. Rather, geographic and temporal proximity is relevant insofar as it weighs on the sufficiency of the specific and articulable facts upon which a stop is based (see People v Torres, 167 AD3d 665, 666 [2d Dept 2018], lv denied 32 NY3d 1210 [2019] ["The police officers had reasonable suspicion to stop the vehicle based on the radio transmission indicating the type and color of the vehicle driven by the perpetrators of the burglary. Moreover, the vehicle was stopped in close geographical and temporal proximity to the crime . . . ." (emphasis added) (internal citations omitted)]; People v Johnson, 22 AD3d 371, 372 [1st Dept 2005], lv denied 6 NY3d 754 [2005] ["The officers had reasonable suspicion upon which to stop and frisk defendant, whose clothing and physical characteristics fit an armed robber's description that was sufficiently specific, given the temporal and spatial factors" (emphasis added)]; People v Rampersant, 272 AD2d 202, 203 [1st Dept 2000], lv denied 95 NY2d 870 [2000] ["The description of a black man wearing a bright yellow jacket and black pants was sufficiently specific, particularly since defendant was arrested at the specified location shortly after the drug sale and was the only person present matching the description"]).
Additionally, apart from Torres, the cases the dissent cites for the proposition that reasonable suspicion to stop a vehicle generally depends on the specificity of the vehicle's description and the geographic and temporal proximity to the reported criminal activity involve stops based only upon general vehicle descriptions, not unique license plate number identifications[*6](see People v Schlau, 117 AD3d 461, 461-462 [1st Dept 2014], lv denied 23 NY3d 1067 [2014]; People v Glaze, 225 AD2d 932, 933 [4th Dept 1998]; People v Nicodemus, 247 AD2d 833, 833-835 [4th Dept 1998], lv denied 92 NY2d 858 [1998] [police officers did not verify the vehicle's identified license plate number before initiating the stop]; People v Baldwin, 41 Misc 3d 1217[A], 2013 NY Slip Op 51723[U], *3-6 [Sup Ct, Queens County 2013]; but see Torres, 167 AD3d at 666]).
Nevertheless, the May 18th stop occurred less than 24 hours after and in close geographic proximity to the May 17th incident (see People v Reed, 106 AD3d 673, 674 [1st Dept 2013], lv denied 21 NY3d 1045 [2013] [police had reasonable suspicion to stop the defendant two days after the last of a pattern of robberies]; see also Schlau, 117 AD3d at 461-462 [police had reasonable suspicion to stop the defendant's vehicle 24 hours after a reported crime when the vehicle precisely matched the description given by the victim, the vehicle was in the vicinity of the crime, and the area was notorious for criminal activity]).
Furthermore, we find that the sufficiency and reliability of Officers Amaral's and Stokes's knowledge of the van's make, model, and license plate number in connection with both prior incidents did not turn on geographic and temporal proximity considerations. The information gleaned from the license plate search, the BOLO alert, and the traffic enforcement agent following the May 17th incident provided the officers with reasonable suspicion to stop the van on May 18th (see generally Balkman, 35 NY3d at 559).
Given that Officers Amaral and Stokes confirmed that the driver was defendant, and their knowledge that defendant had used a gun in one of the prior incidents, the officers appropriately ordered defendant to step out of the van for their own safety (see People v Robinson, 74 NY2d 773, 774 [1989], cert denied 493 US 966 [1989]; People v Martinez, 147 AD3d 642, 643 [1st Dept 2017], lv denied 29 NY3d 1034, 1036 [2017]), and then in forcibly removing defendant when he refused to comply. Defendant's act of reaching for a gun from the van's center console and pointing it at one of the officers independently furnished probable cause for his arrest (see People v Sanchez, 216 AD2d 207, 208 [1st Dept 1995], lv denied 87 NY2d 850 [1995]).
The lineup procedure was not unduly suggestive. The photographs of the lineup reveal that the fillers were sufficiently similar to defendant in skin tone, facial hair, age, and height (see People v Bazemore, 147 AD3d 698, 698 [1st Dept 2017], lv denied 29 NY3d 1076 [2017]; People v Perez, 128 AD3d 465, 465 [1st Dept 2015]). Additionally, the lineup participants were all given baseball caps to minimize the differences in their hairstyles, provided a blanket to obscure differences in their clothing and bodies, and seated to minimize their height differences (see People v Holley, 26 NY3d 514, 525 [2015]). The use of only four fillers did not invalidate [*7]the lineup procedure (see e.g. People v Santos, 250 AD2d 413, 414 [1st Dept 1998], lv denied 92 NY2d 905 [1998], cert denied 525 US 1076 [1999]; see also People v Hernandez, 164 AD2d 920, 921 [2d Dept 1990]).
We perceive no basis for reducing the sentence.
Accordingly, the judgment of the Supreme Court, New York County (April A. Newbauer, J.), rendered June 30, 2022, convicting defendant, after a jury trial, of criminal possession of a weapon in the second degree (four counts) and reckless endangerment in the first degree, and sentencing him to an aggregate term of 9½ years should be affirmed.
All concur except Rodriguez, J. who dissents in an Opinion.

Rodriguez, J. (dissenting),

Among the issues presented by this appeal is whether the arresting officers had reasonable suspicion to stop defendant's van.[FN4] As applied here, the question of reasonable suspicion is a somewhat convoluted one: when witnesses report that a vehicle, identified by its license plate, was involved in two separate criminal incidents, does this fact alone furnish officers with reasonable suspicion to stop any person driving the vehicle at some later point even if, before effecting the stop, the officers fail to identify the driver of the vehicle as someone matching the description of the perpetrator of the first crime, which occurred approximately three weeks before the stop, and no description was provided of the driver during the second incident, which occurred approximately 24 hours before the stop? On this record, and considering the totality of the circumstances, the issue of whether the officers had reasonable suspicion to stop defendant's van is doubtless a close one. I nevertheless find that the officers' stop of defendant's vehicle was not supported by reasonable suspicion, and I therefore respectfully dissent.
On April 28, 2019, the driver of defendant's white Dodge Caravan, identified by its license plate, was observed discharging a weapon during a road rage incident in Washington Heights in Manhattan. An eyewitness to the incident described the driver as a Hispanic man "in [his] thirties," with facial hair and a medium build. The detective assigned to the case, Detective Thomas, generated an NYPD Domain Awareness System (DAS) report for the vehicle; the report listed the registered owner as defendant Amado Zubidi and gave his address as Baruch Drive on the Lower East Side of Manhattan. During a telephone conversation on April 30, 2019, Detective Thomas asked defendant to come to the precinct to answer some questions, and defendant responded that he would do so the next day. Following this conversation, in which defendant placed himself in Washington Heights two days earlier, Detective Thomas issued a suspect I-card indicating that defendant was a person of interest in the investigation. The next day, defendant's attorney called Detective Thomas, asking if he wanted defendant to come in. Detective Thomas testified that because he did not want defendant to change [*8]his appearance in anticipation of an identification procedure, he declined counsel's offer. On May 2, 2019, Detective Thomas issued an officer safety or "be on the lookout" (BOLO) alert for defendant's white Dodge Caravan with the license plate identified.
On May 17, 2019, at approximately 7:00 a.m., a traffic enforcement agent observed defendant's vehicle illegally parked in front of a fire hydrant on Baruch Drive. The agent testified that when he scanned the license plate, he received a message indicating that the van was stolen,[FN5] information which he then reported to a police department dispatcher. The dispatcher replied that two officers would respond, and the agent proceeded with issuing a summons. As the agent walked toward the vehicle, it pulled away "fast." The agent testified that the driver "tr[ied] to run me over." He also testified that the vehicle was "maybe[] 10, 15 feet" away as it passed him.
Afterward, Officers Amaral and Stokes arrived at Baruch Drive, and the agent described what had just occurred. Besides identifying the driver as male, the agent did not provide a description of the driver to the officers.[FN6] Officer Amaral testified that he performed a search for defendant's license plate, which indicated that the van was registered to defendant and that the vehicle was wanted in connection with a road rage incident in the 33rd Precinct. The license plate search further indicated that the driver of the vehicle was a "Hispanic male that was armed and dangerous." Officer Amaral testified that although he was aware of the detective assigned to the case, he did not try to call the detective after he looked up the license plate. Additionally, he did not know whether Officer Stokes tried to reach the detective.[FN7] After discussing the matter with other officers later on the 17th, Officers Amaral and Stokes agreed that they would stop the vehicle if they saw it the next day.
Early on May 18, 2019, approximately six hours before the stop, Officers Amaral and Stokes saw the van parked near the corner of Columbia and Rivington Streets on the Lower East Side. They approached it and looked inside with flashlights, but there were no occupants and no weapons in plain view. Officer Amaral testified that they therefore could not "detain the car or anybody associated with it at that time." The officers parked near the van because they were interested in it, but they provided enough distance so that the owner of the vehicle would not see them, get scared, and walk away from the car. Later, just before 6:00 a.m., the officers saw the vehicle driving towards the intersection of Columbia and Rivington Streets and then turn right onto Columbia. They had not seen anyone get into the vehicle before it pulled off from its parking spot. Without observing who was driving it, Officer Amaral turned on the police car's lights and sirens, made a U-turn, and stopped the van on Columbia. Officer Amaral asked for the driver's license and registration to "confirm [*9]who the driver was for that vehicle" and ensure that the driver "was the same person who the vehicle was registered to."
"Under the settled law of New York, an automobile stop 'is a seizure implicating constitutional limitations'" (People v Hinshaw, 35 NY3d 427, 430 [2020], quoting People v Spencer, 84 NY2d 749, 752 [1995], cert denied 516 US 905 [1995]). As relevant here, "[a]utomobile stops are lawful . . . when based on a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime" (Hinshaw, 35 NY3d at 430, citing Spencer, 84 NY2d at 752-753). "Reasonable suspicion is 'that quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe criminal activity is at hand'" (People v Messano, 41 NY3d 228, 232 [2024], quoting People v Martinez, 80 NY2d 444, 448 [1992]). With respect to vehicles associated with prior crimes in particular, whether the police have reasonable suspicion to effect a stop depends, in general, on the specificity of the vehicle's description and the proximity of the vehicle, geographically and temporally, to the prior crime's location (see e.g. People v Torres, 167 AD3d 665, 666 [2d Dept 2018], lv denied 32 NY3d 1210 [2019]; People v Schlau, 117 AD3d 461, 461-462 [1st Dept 2014], lv denied 23 NY3d 1067 [2014]; People v Argyris, 99 AD3d 808, 810 [2d Dept 2012], affd 24 NY3d 1138 [2014], cert denied 577 US 1069 [2016]; People v Glaze, 255 AD2d 932, 933 [4th Dept 1998], lv denied 93 NY2d 853 [1999]; People v Nicodemus, 247 AD2d 833, 833-835 [4th Dept 1998], lv denied 92 NY2d 858 [1998]; People v Baldwin, 41 Misc 3d 1217[A], 2013 NY Slip Op 51723[U], *3-6 [Sup Ct, Queens County 2013]; see also n 8, infra).
It must be noted that, "[w]hile the nature and degree of the governmental interest at issue here—investigation and detection of past criminal conduct—is undoubtedly significant, it does not implicate the same important social objectives that are at issue when police are investigating recent or ongoing suspected criminal activity" (Spencer, 84 NY2d at 754). Indeed, unlike investigations into recent or ongoing criminal activity, "officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop" (id. at 755, quoting United States v Hensley, 469 US 221, 228-229 [1985]).
In this context, "it is appropriate to emphasize that what is fundamentally at issue . . . is the extent to which constitutional liberties can and should be compromised for the sake of more effective law enforcement" (People v Turriago, 219 AD2d 383, 394 [1st Dept 1996], mod on other grounds 90 NY2d 77 [1997]). With this acknowledged balance in mind, "courts have made a reasoned determination that the occasional loss of the opportunity for apprehension is outweighed by the need to preserve the freedom of movement of the general populace by requiring the police to demonstrate [*10]reasonable suspicion of criminal activity before infringing upon an individual's liberty" (id. at 395; see People v Sobotker, 43 NY2d 559, 565 [1978] ["Almost any series of indiscriminate seizures is bound to produce some instances of criminality that might otherwise have gone undetected or unprevented. But were hindsight alone to furnish the governing criteria, a vital constitutional safeguard of our personal security would soon be gone"]).[FN8]
Here, the arresting officers knew that: (1) a Hispanic man approximately in his thirties with facial hair and a medium build was driving during the April 28th incident; (2) on May 17th the same vehicle was driven by a man who tried to evade a traffic ticket and almost hit a traffic agent in the process; and (3) the vehicle was owned by defendant and also parked near his residence on May 18th. The officers did not know that the driver of the May 17th incident was later described by the traffic agent as a Hispanic man. Further, the officers had no information suggesting that the owner of the vehicle matched the description provided by the witness of the April 28th incident. Put differently, the officers' stop of the vehicle on May 18th was based purely on inference, utilized to connect three silos of information. That is, the officers connected information (1) relating to the April 28th incident, (2) relating to the May 17th incident, and (3) concerning the vehicle's ownership and geographic proximity to the owner's home. That connection was based not only on the general possibility that the driver of a vehicle may be its owner (see Kansas v Glover, 589 US 376 [2020]),[FN9] but on further reckoning that today's owner-driver is probably the same person as the driver yesterday and, separately, the driver on April 28th. The question presented is accordingly whether those inferences, and the bases therefor, justify reasonable suspicion for the stop of defendant's van here.
Consideration of the connection between each incident is thus warranted. As to the May 17th incident, the noted inferences were somewhat fairer, since that later incident occurred on defendant's relatively short street and much closer in time to the stop approximately 24 hours later. Suspicion that it may have been the owner driving on April 28th, however, could only be arrived at by inference nearer to surmise based on the vehicle's proximity to the owner's residence weeks afterward, as well as the generality concerning owner-drivers (see Glover, 589 US 376). In any case, given the arresting officers' complete failure to observe the driver of the vehicle prior to the stop, their total mix of information was significantly more attenuated. Additionally, because the officers did not have information suggesting that defendant (the owner) matched the description provided by the witness of the April 28th incident, it is ultimately of no moment that the vehicle was parked near defendant's home shortly before the stop, as that fact brought the officers no [*11]closer to reasonable suspicion than the general notion that a vehicle's owner is with some vague frequency its driver.
In short, without confirmation that either (1) the vehicle's owner or (2) the driver the day of the stop matched the description provided by the witness following the April 28th incident, the information known by the officers at the time of the stop was insufficient to furnish them with reasonable suspicion that defendant had committed a crime (see People v Holley, 188 AD3d 1644, 1646 [4th Dept 2020], lv denied 37 NY3d 965 [2021] ["The mere fact that a person is driving a vehicle that has been previously used in a crime is insufficient to permit the seizure of that person"]; see also People v Dawkins, 163 AD2d 322, 324 [2d Dept 1990] ["While clearly the police had reasonable cause to believe that the car registered to the defendant was involved in the incident, the only indication that [the detective] had that the defendant was in the car at that time was that he apparently fit the very vague description of one of the perpetrators that [the detective] had received from the complainant. It has consistently been held that such general descriptions are not sufficient to constitute reasonable suspicion"]; cf. People v Hunter, 219 AD3d 975, 978 [3d Dept 2023]; People v Sellers, 168 AD2d 581, 582 [2d Dept 1990], lv denied 77 NY2d 911 [1990]; but see People v Cooney, 137 AD3d 1665, 1666 [4th Dept 2016], appeal dismissed 28 NY3d 957 [2016]; People v Dearmas, 48 AD3d 1226, 1127 [4th Dept 2008], lv denied 10 NY3d 839 [2008]; People v Myers, 172 AD2d 632, 632 [2d Dept 1991], lv denied 78 NY2d 1079 [1991]).[FN10]
As with all decisions defining the bounds of lawful police conduct, serious constitutional concerns are implicated here. For instance, a conclusion that reasonable suspicion existed at the time of this stop would, under these circumstances, necessarily be predicated on an owner-driver inference of such magnitude that it would amount, in practical terms, to an owner-driver presumption. The danger of such a presumption is patent, as it would, without tailored reservations, be seemingly permanent and immutable. Given the independent details known to the officers at the time defendant was stopped here—and the consequent reliance on such a presumption—the question would thus arise of when, if ever, reasonable suspicion would cease. Many years of course may pass in which a vehicle's characteristics, including its unique license plate number, remain unchanged. Combining this fact with such an owner-driver presumption results in a framework whereby there might be no point, aside from a vehicle's sale, at which the temporal link to an underlying crime would prove too tenuous for a lawful stop.
Accordingly, the majority's decision, and its implicit determination that this owner-driver presumption is an adequate basis to furnish the officers with reasonable suspicion, provides support for the precarious proposition that a driver may lawfully be stopped [*12]at any time so long as the vehicle being driven was involved in a crime at some point in the past. This is true even when, as here, prior to effecting the stop the officers fail to confirm that the driver matches a description of the earlier crime's perpetrator. In the absence of a considered framework, the majority's decision therefore seemingly supports reasonable suspicion not only as attached to the car (as opposed to any individual), but also apparently continued in practical perpetuity, regardless of temporal or geographic proximity to the alleged crime and irrespective of the identity of the driver.
Given that cases examining reasonable suspicion in similar situations almost uniformly emphasize the temporal and geographical proximity of vehicles to the alleged crimes (see e.g. People v Argyris, 99 AD3d at 810; People v Rose, 72 AD3d 1341, 1342-1344 [3d Dept 2010], lv denied 16 NY3d 745 [2011]; People v Fleming, 65 AD3d 702, 703 [2d Dept 2009], lv denied 13 NY3d 907 [2009]; People v Schwing, 14 AD3d 867, 868 [3d Dept 2005]; People v Elmore, 236 AD2d 851, 851-852 [4th Dept 1997], lv denied 89 NY2d 1034 [1997]), and further observe where appropriate that officers' observations of drivers or occupants were consistent with descriptions of suspects (see e.g. People v Clark, 191 AD3d 1485, 1486 [4th Dept 2021], lv denied 37 NY3d 954 [2021]; People v Bolden, 109 AD3d 1170, 1172 [4th Dept 2013], lv denied 22 NY3d 1039 [2013]; People v Carlson, 277 AD2d 158, 158-159 [1st Dept 2000], lv denied 96 NY2d 733 [2001]; People v Maye, 206 AD2d 755, 757 [3d Dept 1994], lv denied 84 NY2d 1035 [1995]), the landscape of precedent provides meager support for the majority's approach in this respect.[FN11] As noted, the only potential limit appears to be a vehicle's sale, and then perhaps depending still on the officers' awareness of the change in ownership (see e.g. People v Jean-Pierre, 47 AD3d 445, 445 [1st Dept 2008], lv denied 10 NY3d 865 [2008] ["mistake of fact . . . may be used to justify a" stop (internal quotation marks omitted)]).
The cases on which the majority relies in concluding Supreme Court correctly determined the stop was supported by reasonable suspicion are either distinguishable or wholly inapposite. Closest to the issue at hand are People v Schlau (117 AD3d 461) and People v Reed (106 AD3d 673 [1st Dept 2013], lv denied 21 NY3d 1045 [2013]). In Schlau, officers stopped the defendant's vehicle 24 hours after the knifepoint rape of a sex worker based on the victim's "detailed description of the rapist's car, including the presence of dents on particular areas of the car" (117 AD3d at 461-462). Schlau is distinguishable, however, since the area to which the defendant returned 24 hours later was "notorious" for sex work, allowing "the police to draw an inference that the rape suspect had returned to look for a similar victim" (id. at 462). Here, there is no indication that the set of city blocks on the Lower East Side with which we are concerned has [*13]any such distinguishing character vis-À-vis evading parking tickets or the like. More importantly, in Schlau the victim provided police with "a description of the rapist," and before the stop at issue "the police saw defendant in the same area as the crime scene in a car precisely matching the description" (id. at 461-462 [emphasis added]).
People v Reed (106 AD3d 673), which involved a pedestrian stop,is similarly distinguishable. As an initial matter, the officer stopped the defendant after "get[ting] a good look at him" and identifying him based on descriptions from two wanted posters—specifically, "male, black, 40 to 50 years old, 5'7" to 5'9" tall, slender build, unshaven beard, and wearing a white cap and white shirt," and "male[,] black, late 40s or early 50s, wearing a dirty white baseball cap and an off-white t-shirt with gray tip sleeves" (id. at 674). Second, the wanted posters concerned "a series of armed robberies" that had "occurred . . . through July 15, 2009 in the 30th and 32nd precincts" (id.), and the stop, which occurred on July 17, 2009, "was in the early morning hours in Northern Manhattan, which was consistent with the information the police had on the pattern crimes" (id. at 675). Unlike here, then, Reed's conclusion that the stop was supported by reasonable suspicion was based on a pattern of activity and a detailed description of the suspect himself.
People v Shabazz (99 NY2d 634 [2003]) and People v Rose (72 AD3d 1341) are appropriately concerned, in their analyses of reasonable suspicion, with the factors of vehicle description specificity and proximity to a reported crime. Beyond that, however, the cases are distinguishable. Although the timelines are not set forth with exact precision, both stops appear to have occurred within an hour or so of the reported crimes (see Shabazz, 99 NY2dat 635 [officers stopped van after receiving "several radio transmissions advising them that shots had recently been fired in two specific locations"]; Rose, 72 AD3dat 1342 [stop on New York State Thruway in Kingston about 45 minutes after Albany officers' response "to 911 call regarding a shooting . . . where they found the victim . . . severely injured and covered in blood from gunshot wounds to his chest and leg," victim described assailants and their vehicle in detail, and victim "believed they were headed to New York City"]). The stops thus "implicate[d]" not the "investigation and detection of past criminal conduct" but, rather, "the . . . important social objectives . . . at issue when police are investigating recent or ongoing suspected criminal activity" (People v Spencer, 84 NY2d at 754).
The majority's more frequent authority, People v Balkman (35 NY3d 556 [2020]),[FN12] held that the prosecution failed to carry its burden in the suppression hearing, and thus granted the defendant's suppression motion and dismissed the indictment (id. at 560). Although the testifying officer stated that he received a database search result called [*14]a "similarity hit" concerning "the vehicle's registered owner and a person with a warrant from the City of Rochester," the officer failed to describe the result's contents, as required (id. at 558-560; see id. at 559-560, citing People v Dodt, 61 NY2d 408 [1984]). To the extent my colleagues in the majority cite Balkman for the proposition that had the officer described the contents of the "similarity hit" in the hearing, the stop would have been lawful, this would be based on a counterfactual beyond any of Balkman's commentary, direct or indirect. In addition, although Balkman indeed observed that "information generated by running a license-plate number through a government database may provide police with reasonable suspicion to stop a vehicle" (id. at 559), its authority for this proposition was People v Bushey (Balkman at 559, citing Bushey, 29 NY3d 158, 160 [2017]), in which the officer learned prior to effecting the stop that the vehicle's registration was suspended (Bushey, 29 NY3d at 160-161). Accordingly, in Bushey, the identity of the driver was irrelevant, as it was simply the vehicle's present operation that constituted the unlawful act justifying the stop (see id.). Thus, Balkman, notwithstanding its uncontroversial recitation of the more general reasonable suspicion standard (see 35 NY3dat 559),adds no support to the majority's holding.
Finally, the majority's detour discussion of the DAS or license plate search result's reliability and sufficiency (citing Balkman and People v Dodt,61 NY2d 408)is both unclear and unprompted by the parties' arguments on appeal.[FN13] First, as the majority notes, Officer Amaral indeed described the contents of the license plate search results. The holding of Dodt, like Balkman, is therefore inapplicable (see Dodt, 61 NY2d at 416 ["the prosecutor offered no evidence of the physical description contained in the teletype, or of defendant's appearance at the time of arrest," thus preventing the suppression court from evaluating whether "there was probable cause"]; see also Balkman, 35 NY3d at 560). Next, it is difficult to interpret defendant's contentions regarding the officers' lack of reasonable suspicion as anything other than challenges to the sufficiency of the officers' held information, whether derived from the license plate search results or their own investigation.[FN14] Further, the contents of the license plate search results, including the officer safety or BOLO alert, provided no separate facts relevant to the analysis of reasonable suspicion; rather, the results included the same silos of information described above.[FN15] Lastly, crystallizing the nature of the disagreement here, Officer Amaral testified that the license plate search results indicated that "the vehicle was wanted in connection to a road rage shooting in the confines of the 33rd Precinct" in Washington Heights (emphasis added).
Of course, the question before this Court is not whether the officers had a reasonable suspicion that the [*15]vehicle was used during the commission of the April 28th and May 17th incidents. Instead, it is whether the officers had a reasonable suspicion that the driver of the vehicle on May 18th was the same as on the prior occasions (see People v Elam, 179 AD2d at 232-233 ["the issue is not simply whether there had recently been some crime involving the car, but whether, if there had been, the defendant could be reasonably suspected of its commission. It bears repetition that before a person may be stopped in a public place a police officer must have reasonable suspicion that such person is committing, has committed, or is about to commit a crime" (internal quotation marks omitted)]). On this question, and although a close case even without resort to the majority's practical owner-driver presumption, I conclude that the stop fails to pass constitutional muster as a result of the officers' failure to visually identify the driver in advance of the stop (compare People v Landy, 59 NY2d 369, 373, 376 [1983]; People v Henry, 150 AD2d 797, 798 [2d Dept 1989], lv denied 74 NY2d 810 [1989]; see also People v Jones, 37 AD3d 163, 163 [1st Dept 2007], lv denied 8 NY3d 986 [2007]).
Ultimately, the officers' stop of defendant's vehicle "before identifying the driver as the man they sought[] constituted an unlawful seizure, since exigent circumstances were lacking and the police could have waited for an opportunity to identify the driver before stopping his moving vehicle" (People v Lindsey, 13 AD3d 651, 652 [2d Dept 2004] [internal citations omitted]; see People v Fulton, 189 AD2d 778, 778-779 [2d Dept 1993], lv denied 81 NY2d 1014 [1993]; see also People v May, 81 NY2d 725, 728 [1992]; Sobotker, 43 NY2d at 564-565 [1978] ["To be sure the circumstances very well may have justified the police, as they pursued their law enforcement obligations, in continuing to keep the car under observation. Then, if patience rather than precipitancy had prevailed, the reward of good police work might well have been a seizure which the continued observation had rendered no longer devoid of a factual predicate for a founded belief that criminal conduct was under way. But, at the premature juncture at which the police did in fact act in this instance, they had come upon no fruit ready for harvesting"]).
For these reasons, I dissent.
Judgment, Supreme Court, New York County (April A. Newbauer, J.), rendered June 30, 2022, affirmed.
Opinion by O'Neill Levy, J. All concur except Rodriguez, J. who dissents in an Opinion.
Oing, J.P., Friedman, González, Rodriguez, O'Neill Levy, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: October 3, 2024

Footnotes

Footnote 1: "Before initiating the stop, [Douglas County Sheriff's Deputy] observed an individual operating a 1995 Chevrolet 1500 pickup truck with Kansas plate 295ATJ. He also knew that the registered owner of the truck had a revoked license and that the model of the truck matched the observed vehicle. From these facts, [the Deputy] drew the commonsense inference that [the defendant] was likely the driver of the vehicle, which provided more than reasonable suspicion to initiate the stop.
"The fact that the registered owner of a vehicle is not always the driver of the vehicle does not negate the reasonableness of [the Deputy's] inference. Such is the case with reasonable inferences" (Glover, 589 US at 381 [emphasis added]).

Footnote 2: Defendant merely challenged the staleness of the BOLO alert, not the existence of the BOLO alert in the DAS search results (see People v Dodt, 61 NY2d 408, 416 [1984]). In any event, "[t]he reliability of the information conveyed [i.e., the BOLO alert from the DAS search] may be assumed by the officer in the field" (id.). The reliability of the information Officers Amaral and Stokes received from the traffic enforcement agent, a fellow law enforcement officer, is presumed (People v Gerard, 197 AD3d 1045, 1046 [1st Dept 2021], lv denied 37 NY3d 1161 [2022]).

Footnote 3: The dissent does not suggest that the May 17th incident, which occurred in the same vicinity and less than 24 hours prior, lacked proximity to the May 18th stop. Defendant dismisses the May 17th incident altogether, asserting that the May 17th incident did not motivate the stop whatsoever. There is no basis in the record for this assertion.

Footnote 4: Defendant challenged whether the officers had reasonable suspicion for the stop, and Supreme Court decided that "the officers had at least reasonable suspicion to believe that the driver of the [vehicle] had committed two separate criminal acts. As a result, the initial car stop was valid." Defendant's argument on appeal was therefore preserved (see CPL 470.05 [2]; see also e.g. People v Jones, 202 AD3d 821, 824-825 [2d Dept 2022]; People v Jones, 164 AD3d 1363, 1364 [2d Dept 2018], lv denied 32 NY3d 1173 [2019]).

Footnote 5: Other than the traffic agent's testimony, there is no further suggestion that defendant's vehicle was stolen.

Footnote 6: Although at the suppression hearing the traffic agent described the driver specifically as a Hispanic man, the record does not contain any support for the proposition that the agent provided a description to the responding officers beyond identifying the driver as male. The traffic agent's testimony instead suggests that the agent was simply describing the driver during the May 17th incident in response to questioning at the hearing, and not that he had ever relayed that information to the officers or otherwise. For his part, Officer Amaral testified that the traffic agent said "that a gentleman walked up to [the] white Dodge [C]aravan . . . , got into the vehicle and drove off, almost hitting him."

Footnote 7: Officer Stokes did not testify at the suppression hearing.

Footnote 8: See also People v Elam, 179 AD2d 229, 234 (1st Dept 1992), appeal dismissed 80 NY2d 958 (1992) ("The instances will be more numerous, however, in which the free rein given the police will result in baseless intrusions upon the innocent. This . . . consequence of inadequately grounded police activity is unfortunately one which the judicial perspective tends to minimize, since Fourth Amendment jurisprudence has evolved almost exclusively in the context of cases in which police action, however baselessly initiated, has uncovered evidence of crime. It is, however, a consequence which must be kept scrupulously in mind, for otherwise a court in its zeal to see the guilty punished will end up by sanctioning the erosion of fundamental constitutional guarantees, the predominant and absolutely essential purpose of which is to shield innocent individuals from the arbitrary assertion of the State's formidable power").

Footnote 9: Glover is cited here only for its discussion and application of a general inference that a vehicle's owner "may well be" its driver at a given time (Glover, 589 USat 387 [Kagan, J., concurring]; see id. at 387-391 [Kagan, J., concurring] [discussing Kansas-specific considerations]). Although the U.S. Supreme Court determined in Glover that an officer's "commonsense inference" that an owner of a vehicle is likely its driver provides "more than reasonable suspicion to initiate the stop" (Glover, 589 US at 381), it bears emphasis that the Court of Appeals has adopted greater protections than the federal courts for police stops of both pedestrians and vehicles (see People v Hinshaw, 35 NY3d at 432 ["to curb potential discriminatory practices, New York also provides greater protections than does federal law for traffic infraction vehicle stops"]; id. at 431 ["In contrast to the Fourth Amendment, which permits brief investigative stops. . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity, this Court has adopted greater protections than Terry and its federal progeny for pedestrian stops by the police. Our De Bour test, in which constitutional law and common law both played a part, is more protective of the rights of individuals to be free from aggressive governmental interference" (internal quotation marks and citations omitted)]; see also People v Gates, 31 NY3d 1028, 1030 [2018] [Garcia, J., dissenting] ["The De Bour method differs significantly from the federal approach"]; People v Mundo, 99 NY2d 55, 58 [2002]; People v Hollman, 79 NY2d 181, 195 [1992]; People v Dunn, 77 NY2d 19, 24 [1990], cert denied 501 US 1219 [1991] ["in the past this Court has not hesitated to interpret article I, § 12 independently of its Federal counterpart when the analysis adopted by the Supreme Court in a given area has threatened to undercut the right of our citizens to be free from unreasonable government intrusions"]; People v Torres, 74 NY2d 224, 228 [1989]).

Footnote 10: To be clear, I conclude that the stop was unlawful because the officers lacked information, beyond a generality regarding owner-drivers, connecting the silos of information that they held. As noted throughout, the officers could have obtained information suggesting that the owner of the vehicle matched the description of the driver on April 28th or that the driver on the morning of the stop matched the description from April 28th. Moreover, under the circumstances here, the stop may have been lawful if the officers had simply obtained information greater than bare inference suggesting that a particular person, whether the owner of the vehicle or otherwise, exclusively or often drove it.

Footnote 11: The majority characterizes "geographic and temporal proximity [as] relevant insofar as it weighs on the sufficiency of the specific and articulable facts upon which a stop is based" and further notes that such proximity "is not . . . a universal requirement of reasonable suspicion" in this context. The majority's catalogued cases on these points, though also noting a vehicle or defendant's physical description, indeed ground their conclusions in geographic and temporal proximity to reported incidents. Accordingly, the case law—and perhaps also the majority's view—is consistent with the earlier observation here that, "[w]ith respect to vehicles associated with prior crimes in particular, whether the police have reasonable suspicion to effect a stop depends, in general, on the specificity of the vehicle's description and the proximity of the vehicle, geographically and temporally, to the prior crime's location." In addition, numerous cases cited throughout this dissent demonstrate the infirmity of the majority's assertion that, "apart from Torres (167 AD3d 665), the cases the dissent cites for the proposition that reasonable suspicion to stop a vehicle generally depends on the specificity of the vehicle's description and the geographic and temporal proximity to the reported criminal activity involve stops based only upon general vehicle descriptions, not unique license plate number identifications" (see e.g. People v Clark, 191 AD3d at 1486; People v Argyris, 99 AD3d at 810 [officer had reasonable suspicion "based on the description of the vehicle and its license plate number that was transmitted over the police radio, and the observation of the Mustang in close geographical and temporal proximity to the scene where the defendant was first observed"]; People v Fleming, 65 AD3d at 703; People v Schwing, 14 AD3d at 868; People v Elmore, 236 AD2d at 851-852; see also People v Hunter, 219 AD3d at 978 [license plate of stopped vehicle differed by one digit from radioed report]; People v Maye, 206 AD2d at 757 [partial plate]). In brief, the veritable disagreement here does not concern the reasonable suspicion standard but, rather, its application to the facts presented.

Footnote 12: The majority mischaracterizes my treatment of People v Balkman (35 NY3d 556). Far from discrediting the case, I merely distinguish Balkman to illuminate that itsholding cannot be fairly read to support the majority's position that the knowledge possessed by the officers here furnished them with reasonable suspicion to stop defendant's vehicle. Furthermore, to rely on defendant's failure to challenge the reliability or purported failure to challenge the sufficiency (see n 10, infra) of the license plate search results is to confuse the issue.Balkman does not stand for the proposition that if a license plate search's contents are established in the hearing, the search's contents in turn necessarily establish that the officers had the requisite level of suspicion required to effect the stop at issue (35 NY3d 556; see People v Hinshaw, 35 NY3d at 437 ["The result of the license plate check provided neither probable cause to conclude a traffic infraction had occurred nor any basis for an objectively reasonable belief that criminal behavior had occurred or was afoot"]; see also People v Dodt, 61 NY2d 408, 416 [1984] ["It is the responsibility of the suppression Judge, not the police, to make that determination"]). Indeed, the Balkman Court itself held that without the evidence regarding the contents of a "similarity hit," "the suppression court could not independently evaluate whether the officer had reasonable suspicion to make the stop" (35 NY3d at 560 [emphasis added]).
Of note, the Court of Appeals has previously rejected the majority's suggestion that merely establishing the contents of a database report automatically demonstrates reasonable suspicion (Hinshaw, 35 NY3d at 459 [Garcia, J., dissenting] ["Indeed, it is well-established that the contents of a database report, produced though a routine registration check, supply at least reasonable suspicion to question the operator of a vehicle"], citing People v Bushey, 29 NY3d at 160; Hinshaw at 437 n 9 ["Although the dissent recognizes that it is the contents, rather than the mere existence, of a database report that may supply reasonable suspicion, the dissent relies on Bushey for the proposition that the contents of the report here—stating that the vehicle should not be treated as stolen and that no further action should be taken—supplied at least reasonable suspicion. That misunderstands our holding in Bushey; there, unlike here, the contents of the database report supplied the officer with probable cause of a traffic infraction before the stop of the defendant's vehicle" (internal citations omitted)]). In sum, Balkman does not do the heavy lifting the majority envisions here.

Footnote 13: Neither party has mentioned, much less raised or disputed, the reliability of the information underlying the officer safety or BOLO alert.

Footnote 14: These contentions include, for example, those in defendant's motion to suppress, post-hearing memoranda of law, and briefs on appeal that, among other things, "the police lacked a reasonable suspicion that Mr. Zubidi had committed, was committing or was about to commit a crime," "there was neither probable cause for his arrest nor reasonable suspicion for his stop and seizure," and the police "lacked the necessary reasonable suspicion to stop the car in the belief that the driver had engaged in criminal activity." Whatever their intention, the majority's apparent interpretation of "sufficiency" from Balkman and Dodt ("defendant never challenged the sufficiency of the DAS search" contents) results in a court precluded from weighing the facts against the relevant standard of proof—a peculiar consequence for a suppression hearing, the very purpose of which is to test defendant's challenge of an intrusion's basis (see e.g. People v Wise, 46 NY2d 321, 329 [1978] ["That the People bear the burden of going forward to justify police activity, such as an arrest or a custodial interrogation, once it is challenged by defendant is too basic to dispute"]).

Footnote 15: Officer Amaral testified that upon his database search, he received (1) "DMV records" of the owner's name and the make and model of the vehicle as well as (2) information indicating "the vehicle was wanted" in connection to the earlier incident, a description of the driver from the earlier incident, and a note that that person "was armed and dangerous." At the hearing, Officer Amaral at no point referred to any part of the search results as a BOLO alert. For his part, Detective Thomas, who created the entry, described it as both a BOLO alert and "just a safety alert." Detective Thomas acknowledged that he "wasn't sure who was driving the car" during the earlier incident, and his testimony did not touch upon whether the alert, in his view, had any significance with respect to transmitting an assessment of reasonable suspicion.
Detective Thomas was also questioned about an interaction with a New York State Trooper that occurred after the alert's issuance but prior to the instant arrest. The record suggests that the Trooper reached out regarding the substance of the alert while the Trooper had the vehicle pulled over for a simple traffic infraction (operation while using two earphones connected to an audio device). Detective Thomas, although he did not speak directly with the Trooper, responded to the inquiry as follows: "I just said that's only a safety, officer safety alert. If they [the Trooper] have anything else, any other traffic infraction[,] then they can go ahead, but that was just a safety alert." Accordingly, to the extent the majority suggests that the alert on its own supplied reasonable suspicion or that a BOLO alert, so designated, establishes reasonable suspicion by its label, I disagree.